[No. C070448. Third Dist. Aug. 19, 2013.]

FRIENDS OF OROVILLE et al., Plaintiffs and Appellants, v.
CITY OF OROVILLE et al., Defendants and Respondents;
WAL-MART STORES, INC., Real Party in Interest and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the introduction, the Factual and Procedural Background, the Standard of Review at the beginning of the Discussion, parts II.A., II.C., and III.A. of the Discussion, and the Disposition of this opinion are certified for publication.

**COUNSEL**

William D. Kopper for Plaintiffs and Appellants.

Cota Cole, Derek P. Cole, Scott E. Huber and Daniel S. Roberts for Defendants and Respondents.

K&L Gates and Edward P. Sangster for Real Party in Interest and Respondent.

**OPINION**

**BUTZ, Acting P. J.**—In this action under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[1] the Friends of Oroville and two individuals (collectively plaintiffs) challenge the City of Oroville's (the City) approval of an environmental impact report (EIR) for the project at issue—a relocated and expanded Wal-Mart Supercenter to replace an existing Wal-Mart of traditional dimension and retail offerings (the Project).

On appeal, plaintiffs contend the City's EIR (1) improperly found it was infeasible for the Project to contribute its fair share mitigation for "Year 2030" cumulative traffic impacts along eight intersections of Oroville Dam Boulevard (hereafter Oroville Dam Blvd.), (2) inadequately analyzed the Project's hydrological impacts, (3) inadequately analyzed the Project's greenhouse gas emissions, and (4) violated CEQA's notice requirements. We find merit in plaintiffs' third contention (in pt. III.A. of this opinion), agree on a

---

[1] Undesignated statutory references are to the Public Resources Code.

tangential point with their first contention, and reverse on those bases, but otherwise shall affirm the judgment denying plaintiffs' petition for writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

The Project is a Wal-Mart Supercenter to replace an existing Wal-Mart store in the City. The Project comprises a nearly 200,000-square-foot building and garden center (about twice the size of the existing Wal-Mart store) and will provide 24-hour retail and grocery services to the City and surrounding areas.

In January 2010, prior to the City's release of the draft environmental impact report (DEIR), the City adopted resolution No. 7471. This resolution interpreted the City's general plan to allow roadway *segments*, rather than *intersections*, to determine the acceptable level of service for traffic along Oroville Dam Blvd.

Plaintiffs earlier filed an action for writ of mandate challenging resolution No. 7471. In response, the City repealed the resolution, and this necessitated a revision of the DEIR's traffic section, which was undertaken in a partially recirculated draft environmental impact report (PRDEIR).

In October 2010, the City released the final EIR, which included responses to public and agency comment.

On November 10, 2010, the City's planning commission held a public hearing and approved the EIR and the Project.

Plaintiffs appealed the planning commission's decision resulting in a de novo public hearing before the City's city council. This hearing took place on December 2, 2010, and was extended to December 14. On December 14, 2010, the city council approved the Project by denying plaintiffs' appeal, certifying the EIR, approving a mitigation program, and adopting findings of fact and a statement of overriding considerations (for significant impacts that could not be mitigated or mitigated fully).

We will set forth specific facts pertinent to the issues on appeal when we discuss those issues.

## DISCUSSION

*Standard of Review*

"In reviewing . . . CEQA issues on appeal, we determine, independently from the trial court, whether [the] City prejudicially abused its discretion either

by failing to comply with legal procedures or by making a decision unsupported by substantial evidence." (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1178 [30 Cal.Rptr.3d 738] (*Anderson*).)

The substantial evidence standard—i.e., enough relevant information and reasonable inferences to support a fair argument-based conclusion, even if other conclusions might also be reached—is applied in reviewing factually based findings, conclusions and determinations. (*Anderson, supra*, 130 Cal.App.4th at p. 1178; Cal. Code Regs., tit. 14, § 15384, subd. (a) [CEQA's regulatory guidelines; hereafter CEQA Guidelines].)

In reviewing the adequacy of an EIR's environmental analyses, a reviewing court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency in providing informed decisionmaking and informed public participation, thereby meeting the statutory goals of the EIR process. (*Anderson, supra*, 130 Cal.App.4th at p. 1178.)

## I.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## II.  Analysis of Hydrological Impacts

Plaintiffs raise four contentions on this subject.

### A.  Baseline Description of Hydrological Conditions

Plaintiffs have two concerns here.

The first concern is with "Mitigation Measure HYD-4" (MM HYD-4), which specifies that, prior to issuance of grading permits for the Project, Wal-Mart shall retain a qualified civil engineer to prepare and submit a drainage plan for City's approval that identifies onsite drainage facilities to ensure that runoff from the Project site is released at a rate no greater than that of the "pre-development condition."

Plaintiffs claim the EIR fails to analyze existing water percolation rates through the highly permeable mining tailings on the Project site and, without that information, it cannot be determined whether there is a feasible drainage solution that will ensure the runoff rate is no greater than pre-development conditions, as MM HYD-4 requires.

---

*See footnote, *ante*, page 832.

The EIR, however, included a geotechnical investigation. This investigation analyzed the surface and subsurface composition of the Project site, including the mining tailings thereon, and performed three distinct tests of how those conditions currently affect water percolation. Furthermore, baseline information about the percolation rates of the mining tailings on the Project site will be part of a required study for the MM HYD-4 drainage plan. Finally, the MM HYD-4 standard of no greater runoff rate is designed to avoid a project-related increase in flooding of adjacent properties during storm events, a standard ascertainable from pre-development flood information.

Plaintiffs' second concern centers on "Mitigation Measure HYD-2a" (MM HYD-2a). That mitigation measure specifies that prior to issuance of building permits for the Project, Wal-Mart shall submit a storm water management plan for the City's approval that identifies pollution prevention measures to prevent polluted runoff from leaving the Project site, that accounts for the Project's net increase of nearly 21 acres of impervious surface area, and that ensures that water quality in downstream water bodies is not degraded. MM HYD-2a specifies 11 pollution prevention measures that this plan must include, but is not limited to; in a response to comments on storm water quality, the EIR notes that these prevention measures have been "widely employed and . . . demonstrated to be effective means at controlling and preventing pollution from entering downstream waterways."

Plaintiffs claim the EIR fails to include information about the baseline water quality conditions at the Project site and the receiving water body, the nearby Feather River.

As for existing water quality, the EIR states, however, that "[t]here are no water bodies in [the City] area listed on the 2006 [federal] Clean Water Act['s] . . . list of impaired water bodies. As such, no [pollution-remedial] Total Maximum Daily Load requirements are in effect for any surface water bodies in the Oroville area." Furthermore, as with percolation rates, existing runoff from the Project site will be part of the study for the MM HYD-4 drainage plan.

We conclude that the EIR's description of the challenged baseline hydrological information is adequate.

*B.*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[*]See footnote, *ante*, page 832.

## C. *Deferral of Mitigation*

Plaintiffs contend that MM HYD-2a (i.e., the storm water management/ pollution runoff plan) and MM HYD-4 (i.e., the drainage plan) improperly defer formulation of specific mitigation strategies until after the Project's approval. We disagree.

■ Deferral of mitigation specifics is permissible where the relevant agency commits itself to mitigation and articulates specific performance criteria or standards that must be met for the project to proceed. (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 793–794 [32 Cal.Rptr.3d 177]; *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1275–1276 [15 Cal.Rptr.3d 176].) The two challenged mitigation measures comply with this principle.

MM HYD-2a states that prior to the issuance of building permits Wal-Mart must submit for the City's approval a storm water management plan that contains, but is not limited to, 11 specified pollution prevention measures to prevent polluted runoff from leaving the Project's site. These specified measures, the EIR notes, have been "widely employed and . . . demonstrated to be effective means at controlling and preventing pollution from entering downstream waterways," and implement "Best Management Practices" in controlling storm water runoff quality.

MM HYD-4 provides that prior to the issuance of grading permits Wal-Mart shall retain a qualified civil engineer to prepare and submit for the City's approval a drainage plan "that will ensure that runoff from the [P]roject site is released at a rate no greater than that of the pre-development condition." This standard seeks to avoid any project-related increase in flooding of adjacent properties during storm events, a standard, as noted, ascertainable from pre-development flood information.

### D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. Greenhouse Gas Emissions

Plaintiffs raise two basic issues relating to greenhouse gas (GHG) emissions. The first one is:

---

*See footnote, *ante*, page 832.

### A. Substantial Evidence Does Not Support the City's Finding That the Project's GHG Emissions Will Have a Less Than Significant Environmental Impact After Mitigation

We agree.

*Legal Background*

The EIR primarily analyzed the environmental impact of the Project's GHG emissions according to a CEQA Guideline that was adopted around the same time the DEIR was completed—CEQA Guidelines section 15064.4, entitled "Determining the Significance of Impacts from Greenhouse Gas Emissions." This Guideline provides in pertinent part:

"(a) The determination of the significance of greenhouse gas emissions calls for a careful judgment by the lead agency consistent with the provisions in [CEQA Guidelines] section 15064 [(§ 15064, subd. (b) requires lead agencies to evaluate potential environmental effects based on scientific and factual data, to the extent possible)]. A lead agency should make a good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of greenhouse gas emissions resulting from a project. A lead agency shall have discretion to determine, in the context of a particular project, whether to:

"(1) Use a model or methodology to quantify greenhouse gas emissions resulting from a project, and which model or methodology to use . . . ; and/or

"(2) Rely on a qualitative analysis or performance based standards.

"(b) A lead agency should consider the following factors, among others, when assessing the significance of impacts from greenhouse gas emissions on the environment:

"(1) The extent to which the project may increase or reduce greenhouse gas emissions as compared to the existing environmental setting;

"(2) Whether the project emissions exceed a threshold of significance that the lead agency determines applies to the project[;]

"(3) The extent to which the project complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or mitigation of greenhouse gas emissions. Such requirements must

be adopted by the relevant public agency through a public review process and must reduce or mitigate the project's incremental contribution of greenhouse gas emissions. . . ."

■ Neither the City nor the Butte County Air Quality Management District, at the time of the EIR, had adopted a plan or strategy for reducing GHG emissions that would apply to the Project. As a result the City adopted, as a threshold-of-significance standard for determining whether the Project's GHG emissions constituted a significant environmental impact, the following standard: "[W]hether the [P]roject would significantly hinder or delay California's ability to meet the reduction targets contained in [Assembly Bill No.] 32"—the state legislation addressing GHG emissions (the California Global Warming Solutions Act of 2006) (Health & Saf. Code, § 38500 et seq., enacted by Assem. Bill No. 32 (2005–2006 Reg. Sess.) (hereafter Assembly Bill 32)). As the EIR explains, Assembly Bill 32 "focuses on reducing greenhouse gases [including carbon dioxide] to 1990 levels by the year 2020. Pursuant to the requirements in [Assembly Bill] 32, a Scoping Plan was adopted [which] outlines actions recommended to obtain that goal." According to the EIR, the Scoping Plan (developed by the State Air Resources Board) "calls for [a] . . . reduction in California's [GHG] emissions, cutting approximately 30 percent from business-as-usual emission levels projected for 2020, or about 10 percent from today's levels [(i.e., 2010, when the EIR here was drafted)]."

Besides the formal Scoping Plan, the EIR also analyzed the Project's GHG emissions under the following informal/voluntary guides for mitigating GHG emission impacts: the State Air Resources Board's "Early Action Measures" (which focus on cool roofs and pavements, and shade trees); the California Attorney General's Web site list of "CEQA Mitigations for Global Warming Impacts" (which focus on water and energy conservation; recycling promotion; waste reduction; and nonvehicular accessibility); and a 2008 "white paper" from the California Air Pollution Control Officers Association (which focuses on matters similar to the previous two guides).

*Factual Background*

The EIR found the following.

Nearly all of the Project's GHG emissions will be in the form of carbon dioxide, except for refrigerant use, which does not emit that gas (refrigerant use will comprise about 17 percent of the Project's total GHG emissions).

At buildout, the Project's (operational) GHG emissions will constitute nearly 15,000 metric tons of carbon dioxide equivalents per year, which is

0.003 percent of California's 2004 emissions. About 68 percent of these emissions will be from motor vehicles. The Project's remaining GHG emission sources, in terms of percentage of contribution, are as follows: natural gas use—4 percent; electrical generation—11 percent; and refrigerant use—as noted, 17 percent.

The mitigation measures adopted for the Project's GHG emissions comprise solar reflective paving and roofing materials (MM AIR-8a, MM AIR-8d); the turning off of truck engines in the loading docks (MM AIR-8b); refrigerant measures that reduce leaks and increase recycling (MM AIR-8c); energy efficiency measures, principally involving lighting, heating, cooling, and refrigeration (MM AIR-8d); and a landscaping plan, emphasizing shade trees in the parking lot (MM AIR 8-e).

Based on this mitigation, the EIR concluded that, since the Project's contribution to California's GHG emissions is less than significant (literally, miniscule), the Project would not significantly hinder or delay California's ability to meet the GHG reduction targets contained in Assembly Bill 32, and, therefore, the Project's environmental impacts from GHG emissions are less than significant.

*Analysis*

■    The City properly adopted Assembly Bill 32's reduction targets for GHG emissions as the threshold-of-significance standard in determining whether the Project's GHG emissions constituted a significant environmental impact. The same standard was deemed proper in *Citizens for Responsible Equitable Environmental Development v. City of Chula Vista* (2011) 197 Cal.App.4th 327 [127 Cal.Rptr.3d 435] (*Citizens*); the project there was a newer, larger Target store to replace an older one (*id.* at pp. 335–336; see *id.* at p. 330).

The problem is the City improperly applied this proper standard in concluding that the Project's environmental impacts from GHG emissions are less than significant. *Citizens*, again, exemplifies the model, showing us a proper way to apply the Assembly Bill 32 threshold-of-significance standard.

As *Citizens* explains, the GHG analysis there "listed the [GHG] emissions for 'business as usual' for the existing Target store and the proposed store at 8,280 metric tons per year and 10,337 metric tons per year, respectively. Thus, under 'business as usual' the proposed Target store would increase greenhouse gas emissions by 2,057 metric tons. However, through the implementation of energy saving measures, the . . . greenhouse gas emissions for the proposed store are reduced to 7,381 metric tons per year, or 2,956

metric tons *less than* 'business as usual.' This amounts to a 29 percent reduction from business as usual" (*Citizens, supra,* 197 Cal.App.4th at p. 337), more than meeting the Assembly Bill 32 target reduction of 25 percent for the year 2020 from business-as-usual emissions (this 25 percent figure was estimated by the GHG analysis in *Citizens*). Furthermore, the energy-saving measures in *Citizens* reduced existing GHG emissions by nearly 900 metric tons, more than meeting Assembly Bill 32's alternative target reduction of 10 percent from current (2010) emissions (this 10 percent figure is set forth in the Scoping Plan for Assem. Bill 32, according to the EIR here). (*Citizens, supra,* at p. 337; see *id.* at p. 336.)

Drawing from *Citizens*, we conclude the City misapplied the Assembly Bill 32 threshold-of-significance standard in two related ways: (1) by applying a meaningless relative number to determine insignificant impact and (2) by failing to ascertain the *existing* Wal-Mart's GHG emissions and the impact on GHG emissions from the Project's mitigation measures.

First, the City noted that the Project, at buildout, would emit operationally about 15,000 metric tons of carbon dioxide equivalents yearly, which is 0.003 percent (i.e., just 3 one-thousandths of 1 percent) of California's 2004 GHG emissions. This relative comparison is meaningless, though, in determining the Project's environmental impact regarding GHG emissions. It conjures a comparison worse than apples to oranges. Of course, *one store's* GHG emissions will pale in comparison to those of the world's eighth largest economy. The relevant question to be addressed in the EIR is not the relative amount of GHG emitted by the Project when compared with California's GHG emissions, but whether the Project's GHG emissions should be considered significant in light of the threshold-of-significance standard of Assembly Bill 32, which seeks to cut about 30 percent from business-as-usual emission levels projected for 2020, or about 10 percent from 2010 levels. (See *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 118–120 [126 Cal.Rptr.2d 441] [discussing an analogous issue of how to determine whether a project's relatively small additional environmental impact is significant in an area already highly impacted].)

Second, the City misapplied the Assembly Bill 32 threshold-of-significance standard by failing to calculate the GHG emissions for the existing Wal-Mart and failing to quantitatively or qualitatively ascertain or estimate the effect of the Project's mitigation measures on GHG emissions (MM AIR-8a through MM AIR-8e). (See CEQA Guidelines, § 15064.4, subd. (a).) Without these determinations, ascertaining whether Assembly Bill 32's target reductions are being met is difficult if not futile. The EIR quantified the GHG emissions for the *proposed* Project (precisely 14,817 metric tons of carbon dioxide equivalents per year for operational emissions) and the sources comprising those

emissions in percentage terms (motor vehicle—68 percent; natural gas—4 percent; electrical generation—11 percent; refrigerant use—17 percent), but failed to do so for the *existing* Wal-Mart store. Surely, if these precise calculations could be done for the *proposed* Project, something similar can be done for the *existing* Wal-Mart. Nor did the EIR make any attempt to determine or estimate the quantitative or qualitative effect on GHG emissions from mitigation measures MM AIR-8a through MM AIR-8e. Consequently, the EIR does not sufficiently show whether Assembly Bill 32's target reductions are being met. These calculations were done in *Citizens*. (*Citizens, supra*, 197 Cal.App.4th at p. 337.) Such calculations and estimates, or a reasonable equivalent, must be done here.

Wal-Mart, in claiming the EIR properly applied the Assembly Bill 32 threshold-of-significance standard, relies primarily on two factors: (1) the measures set forth in the Assembly Bill 32 Scoping Plan to reduce GHG emissions and (2) a particular traffic study and conclusion.

The Assembly Bill 32 Scoping Plan, as noted, was developed by the State Air Resources Board and outlines measures (transportation-, energy-, and environment-related measures) to achieve the threshold-of-significance standard of Assembly Bill 32, which, according to the EIR, seeks to cut about 30 percent from business-as-usual emission levels projected for 2020 or about 10 percent from 2010 levels. The EIR recognizes, however, that "most of the reduction measures [specified in the Scoping Plan for reducing GHG emissions] are not applicable to the [P]roject." As Wal-Mart explains in its respondent's brief on appeal: "The City considered the provisions of 'Scoping Plan Measures' . . . to achieve [Assembly Bill] 32 targets. Those that related to transportation were inapplicable to the Project because they had to be implemented at a statewide level." Thus, while the energy- and environment-related measures of the Scoping Plan may apply to the Project, the transportation-related measures do not; and, as we have seen, transportation-related GHG emissions comprise nearly 70 percent of the Project's GHG emissions.

■ By placing great weight on Scoping Plan consistency to sustain the City's finding that the Project's GHG emissions will have a less than significant impact after mitigation, Wal-Mart ignores the elephant in the room—68 percent of the Project's GHG emissions come from motor vehicles. As noted, the EIR does not provide any figures regarding the existing Wal-Mart's GHG emissions or any figures regarding the effect of the Project's mitigation measures on GHG emissions (MM AIR-8a through MM AIR-8e, which are largely energy- and environment-related measures). (Contra, *Citizens, supra*, 197 Cal.App.4th at p. 337.)

Nor does the traffic study and conclusion, upon which Wal-Mart relies, help matters. The EIR, in its section on energy conservation, citing the traffic study and conclusion, states: "The Institute of Transportation Engineers[,] Trip Generation [(8th ed. 2008)] indicates that a freestanding discount superstore (e.g., a [Wal-Mart] with a grocery component) generates 4.09 fewer daily trips per 1,000 square feet than a freestanding discount store (e.g., a conventional [Wal-Mart] without a grocery component)." From this, the EIR concludes that a one-stop shopping destination (i.e., a superstore) may reduce multiple and out-of-town trips for the City's residents. However, the EIR, in its section on GHG emissions, concludes that the Project will "not result in any significant changes in vehicle miles traveled" and, in yet another section (on transportation), suggests that the Project is so large a retail destination, there will be round trips to it of up to 40 miles from neighboring communities. These speculative and contradictory conclusions do not close the evidentiary sufficiency gap involving the City's finding that the Project's GHG emissions will have a less than significant environmental impact after mitigation.

We conclude there is insufficient evidence to support the City's finding that the Project's GHG emissions will have a less than significant environmental impact after mitigation.

### B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

We reverse the judgment to the extent it denied plaintiffs' petition for writ of mandate—and we remand this matter to the trial court to grant the petition—as to the following two EIR issues: (1) to ensure Wal-Mart has paid or will pay "all transportation-related fees to [the City] in accordance with the latest adopted fee schedule," as required by MM TRANS-2a of the EIR approved by the City and (2) to ensure the Project's GHG emissions constitute a significant or a less than significant environmental impact in light of a proper application of the threshold-of-significance standard of Assembly Bill 32, which, according to the EIR, seeks to cut about 30 percent from business-as-usual emission levels projected for 2020 or about 10 percent from

---

*See footnote, *ante*, page 832.

2010 levels. As part of this analysis, the EIR must set forth how the Project's EIR-specified operational GHG emissions compare to those for the existing Wal-Mart store, and must provide a quantitative or qualitative determination or estimate of the mitigation measures' effect on GHG emissions (MM AIR-8a through MM AIR-8e). In all other respects, the judgment is affirmed. Plaintiffs are awarded their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

Mauro, J., and Murray, J., concurred.

On September 18, 2013, the opinion was modified to read as printed above.